STATE OF MAINE
PENOBSCOT, ss.

FILED AND ENTERED
SUPERIOR COURT

AUG 0 9 2002

PENOBSCOT COUNTY

SUPERIOR COURT
CRIMINAL DOCKET NO.
CR-00-11
RAC-PEN-

STATE OF MAINE

)
v.                                )          <u>DECISION AND ORDER</u>    DONALD L. GARBRECHT
                                  )                                            LAW LIBRARY
JEFFREY A. COOKSON,      )
          Defendant        )                                       AUG 13 2002

The matter is before the court on the Motion for New Trial of the defendant,

Jeffrey Cookson ("Cookson"). For the following reasons, the motion is denied.

BACKGROUND[1]

This case revolves around the December 3, 1999 deaths of 20-year-old Mindy

Gould ("Mindy") and 21-month-old Treven Cunningham ("Treven"). The court

conducted a trial on this matter from November 27 to December 6, 2001. In the course of

the trial, the State presented evidence linking Cookson to the murders. Specifically, the

State introduced evidence, including motive, opportunity, and ballistics evidence,

showing that Cookson had committed these crimes. After the trial, the jury found

Cookson guilty of murdering both Mindy and Treven. Shortly after the jury read its

verdict, the court conducted an in-chamber conference during which Cookson's lead

defense counsel, William Maselli ("Maselli"), revealed that a David Vantol ("Vantol")

"confessed to killing . . . Mindy Gould and Treven Cunningham with the 9 millimeter

Taurus firearm . . . ." In-Chamber Conference Transcript, p. 2. Based on this

information, Cookson moved the court to order a new trial. The court conducted a

hearing on this matter on February 1 and 21, 2002, and heard the parties' arguments on

July 26, 2002. Cookson's Motion for New Trial focuses on the veracity of the State's

ballistics evidence, and the post-trial revelation of Vantol's confession.

**1. Ballistics Evidence**

     **a. Testimony and Evidence Introduced at Trial**

During the trial, the State offered the testimony of two firearms examiners from

the state crime laboratory. The first was Bryan Bachelder ("Bachelder"), an investigator

---

[1] The court will address additional specific factual information as it is needed in the discussion section.

who has been assigned to the firearms section of the crime laboratory since 1994, and who has conducted several thousand examinations of firearms, casings, and projectiles. Bachelder testified at the trial that in comparing the casings recovered from the scene of the crime, he determined that not only had the casings been fired from the same firearm, but that those casings had been fired from the same firearm as had casings collected from Douglas Fletcher, Thomas Wright, Glenn Osgood, and John Fletcher, each of whom had at one time owned a firearm, namely a Taurus 9 millimeter handgun, that Wendell Millett testified he traded to Cookson. He made this determination by examining the shell casings and finding the "unique characteristics" of the gun that fired the casings. As Bachelder testified,

> several marks that are left behind on the shell casing from the breach face that's been tooled. And, like I said, microscopically, tools, as they're manufacturing parts of the firearm, are wearing. Those tools then become unique, what we call unique characteristics.
>
> I match the unique characteristics left behind on a shell casing after it's been fired by either the breach face or the firing pin as it strikes the primer, which is the small catalyst for the explosion that cures inside the fire – inside the shell casing.

Trial Transcript, Volume 5, p. 196.

The second examiner, Charles Helms ("Helms"), also worked in the state crime laboratory as a firearms examiner. Helms began studying firearms identification in 1989 and has since examined 3,000 pieces of evidence. At the trial, Helms described how firearms examiners identify the firearm out of which a projectile was expelled:

> We use what's called a two-stage comparison microscope where we can view both spent bullets or spent casings in conjunction with each other.
>
> What we're looking for is unique marks or accidental marks on the bullet that's left by the rifling in the barrel or the extractor, ejector, and firing pin of certain firearms.
>
> When the firearm is built at the factory, when the barrel is built, rifling grooves are placed in the barrel, and that's done by a metallic tool most of the time, either known as a button or a cutting broach. And, as that tool is cutting, the microscopic imperfections where that barrel is changing all the time. Consequently, you can identify the microscopic marks from one bullet to the next as they're imparted from a barrel.
>
> The same thing will happen with a spent casing. Not only is that barrel propelled at high pressure down through the barrel from an explosive force, the spent casing is also forced back and out. What you feel when you fire the gun is recoil.

2

So those marks are then imparted there, the extractor marks. It takes the bullet from the chamber, sometimes the firing pin mark, sometimes the breach face marks – when the fitter builds the weapon, he may take two strokes on a file this way on the breach face, six strokes in this direction, so every one is different and unique to itself.

We can also use what's called class characteristics. And looking at firearms – and this is where firearms identification started back in the 1800s. Colt may put six lands and grooves on the barrel, and Smith and Wesson may put seven or five.

So if we look at a bullet and we count six lands and grooves from an offense, and we have another bullet that's submitted to use and it has five or eight lands and grooves, we can discount that bullet without even any further examination.

Trial Transcript, Volume 5, pp. 152 – 154. Helms concluded that the bullets retrieved from under the front door step of Cookson's father's former home were similar in appearance to the bullets retrieved from near the payphone at the Log Cabin Store. Moreover, he concluded that a bullet from Mindy's autopsy was fired from the same gun as a bullet retrieved from the wood floor under the bed. Helms also found that a bullet taken from Cookson's property was fired from the same firearm that fired the bullets retrieved from Mindy and the wood floor underneath Treven, and that the two shell casings found at the scene had been fired from the same gun.

At the trial, the defense neither cross-examined the State's experts nor produced its own ballistics expert.

**b. Testimony and Evidence Introduced at the Motion for New Trial Hearing**

At the February 21, 2002 hearing, the court again heard from Bachelder, who stated that the gun recovered by Vantol "was the firearm that was used to fire the cartridge cases and bullets found at the scene," and that the casings that were provided by the prior owners of the Taurus referred to at the trial were not a match with the casings found at the crime scene.

Bachelder testified that he had read an article in a firearms examiner publication, which discussed the Taurus Model-92 firearm. The article showed

a manufacturing process by which a characteristic is put on the breach face of the firearm that, when I examined the original evidence in this case, that characteristic that I thought was a unique characteristic is not a unique characteristic. It occurs intermittently with the wear of the drilling machine.

3

Motion for New Trial Transcript, Volume 2, p. 90. Thus, when Bachelder, who had never examined a Taurus PT-92 or PT-99 before this case, identified the trial gun as the same gun that fired both the casings of Fletcher, Wright, and Osgood, and those found at the crime scene, he mistakenly made it on a class characteristic, not a unique characteristic. As he explained:

> Normally when you receive a firearm and a firing pin has struck the primer, the firing pin goes through a breach or as a part of the slide, there's a hole drilled, and that allows the firing pin to come through. As the firing pin comes through, as the trigger's pulled, it strikes the primer.
>
> Normally this is a nice flat area on the breach. What occurred in the cartridge cases that I looked at from the Taurus that has been fired is there's a concave area in the breach portion of the firearm where the firing pin comes through. That area is actually concaved where the firing pin would – would protrude outward. That, in turn, when the firing pin strikes the primer, allows for a volcanic-type area found on the primer itself.
>
> When I examined – previously examined the cartridge cases, I treated this area as a unique characteristic. I had never seen it before in my examinations of all the cartridge cases and firearms that I had looked at. I had the article that I mentioned earlier. I read that, and it depicted the Taurus firearm. And they have – they're called CNC drilling machines that actually drill the hole in the breach face of that slide that allows the firing pin to come through.
>
> Well, these machines get worn; and, in the drilling process, they don't only just drill the holes the proper diameter, but the machine goes a little bit too far and causes that counter-sunk area around the firing-pin hole. When this happens, as it does intermittently – I contacted Taurus International in Miami, and they said it happens on both the Model-99 and the Model-92, which are the firearms that we're talking about here today, the Model-99 being associated with the chain evidence, and the Model-92, which was recently submitted to me, both of those firearms have this characteristic.
>
> The article that I looked at depicted this characteristic. I immediately took it to my supervisor when I saw that and said I made my ID on what was a class characteristic rather than a unique characteristic.

Motion for New Trial Hearing Transcript, Volume 2, pp. 104-106.

The State also presented testimony from Robert Hathaway ("Hathaway"), a firearms expert from the Rhode Island State Crime Laboratory in Kingston, Rhode Island. Hathaway described what features an examiner looks for when determining whether a projectile was fired from a particular gun.

> There's a number of items that we can look at on a cartridge case for the purpose of identification. The primary – probably most important issue, first off, would be

4

the firing-pin impression. It strikes the primer to ignite the cartridge in the first place.

Secondly, after the cartridge case has ignited the powder internally and the bullet starts going down the barrel, tremendous pressure pushes that cartridge case back against what we call the breach area.

So, secondly, we would look at the breach area to see if there are impression tool marks on the cartridge case that we can identify.

From there we can look for extractor marks that might have pulled a cartridge case out of a semiauto pistol, ejector marks that might remain from a semiautomatic pistol.

We can look for chamber marks on the outer diameter of the forward part of the cartridge case, and we can also look for magazine marks that might have contained that cartridge at some time in a semiauto-type weapon.
***

From my standpoint, I . . . consider the two most important [types of marks] the firing-pin and the breach-face marks because they are indicative at that point that that cartridge case was struck by either the firing pin or picked up tool marks due to excessive pressure against the breach area.

Motion for New Trial Transcript, Volume 2, pp. 127-128. Hathway testified that he would have declared the ballistics evidence at the time of the trial inconclusive.

### 2. Vantol's Confession

After the December 6, 2001 in-chamber conference, Vantol met with the State Police, made several taped confessions, took a polygraph test, and gave a detailed statement about all of his activities on the day of the homicides. Furthermore, he led the police to the location of what turned out to be the actual murder weapon.

In his confession,[2] as relayed to the police on December 13, 2001, Vantol stated the following. Cookson asked Vantol four or five times in the week prior to the murders to "do Mindy in." Cookson said he would pay Vantol $10,000, and another $10,000 if he would kill Melanie too. On the night of December 2, 1999, Vantol agreed to kill Mindy. The next morning, December 3, 1999, Cookson woke Vantol, who was staying at Scott Cookson's home, between 5:30 and 6:00a.m. and said "c'mon, let's go." As they were leaving, Cookson directed Vantol to grab a snowmobile part, as that was the ruse Vantol

---

[2] In actuality, this confession was, for lack of a better term, Vantol's "second confession." Vantol had earlier approached Cookson's defense counsel with his "first confession," according to which Vantol went to Dexter, alone and without Cookson's knowledge, to "get a bag of weed." When he arrived at 136 Church Street, Mindy thought he was there to get her and pulled the gun on him. At that point, Vantol grabbed the gun from her, shot her in self-defense, then shot Treven. Cookson's counsel eventually informed him that they didn't believe that story.

5

would use to get inside the house. They left Scott's in Cookson's Geo Tracker, and stopped at a convenience store, where Cookson bought brown gloves for Vantol. After driving for a few minutes, Cookson dropped Vantol off at a four-way intersection, and picked him up about 10-15 minutes later in a Chevrolet Celebrity. Although Vantol does not remember when, Cookson gave Vantol the gun, which had been in a bag between the driver's and passenger's seat. The two then drove to Dexter, drove by 136 Church Street, and parked and waited for Alan LaFountain to leave. They then parked the Celebrity and walked down the railroad bed behind the house. They then got back in the car, drove around for a few minutes, and Cookson dropped Vantol off. At that point, Vantol went up to 136 Church Street and knocked on the front porch door. Mindy answered and let him in. Vantol told her that he needed a snowmobile part. Mindy said that Alan was not there, but that Vantol could leave a number at which Alan could reach him later. As Vantol began to write the number, he scribbled it out and pulled out the gun. Although Mindy said nothing, she ran into the bedroom, got on the bed and put a pillow over her head. Vantol followed her, placed the gun to the pillow, and shot her in the head. He lifted the pillow to see what he had done, dropped the pillow, and saw Treven standing in the doorway looking at him. Vantol grabbed Treven, put him over Mindy's legs, grabbed another pillow, put it over his head, and shot Treven in the head. He then walked out of the house and began walking towards Dover when Cookson picked him up. They then went to Cookson's dad's house and put the bullets underneath the front door step.

In addition to the recorded verbal confessions, Vantol also signed a written confession, in which he stated:

I know Jeffrey Cookson[.]
On the morning of 12/3/99 I was with Jeffrey Cookson[.]
On the morning of 12/3/99 I shot Mindy Gould and Treven Cunningham[.]

By signing this statement, I am taking responsibility for and declaring ownership of the information stated on it. This is my statement.

Dated: December 8, 2001          /s/David Vantol
Time: 0950                       /s/ Witness (Det. Troy A. Gardner)

At the February 1, 2002 hearing, Vantol recanted his confession and testified that he was in no way involved in the killing of Mindy and Treven. He testified that he

6

recanted his confession while in Acadia Hospital and that he fabricated the confession at Cookson's request. Vantol testified that although he hardly knew Cookson and had not seen him for approximately six months, Cookson asked to see Vantol at the Penobscot County Jail. Records show that Vantol had "contact visits"[3] with Cookson on November 4, 2001 for approximately 45 minutes, November 25, 2001 for approximately 45 minutes, and December 2, 2001. Vantol testified that on the November 4th visit, Cookson promised to pay Vantol money and to get him a good lawyer if he would tell his defense counsel a story, the "first confession." At the hearing, the State called Corrections Officer Michael Parady, who testified that on November 4, 2001, he was assigned to monitoring "contact visits" and signing visitors in. Parady testified that during Vantol's visit with Cookson on November 4, Vantol and Cookson "conversated during the whole visit, pretty much leaning in towards each other, talking quietly. What was said I couldn't say." Motion for New Trial Transcript, Vol. 1, p. 197. Parady stated that the two were "[m]aybe 12 inches" apart, and that they were "[f]ace to face. Pretty close." Id.

Vantol further stated at the hearing that when Cookson's attorneys did not believe the "first confession," Cookson told Vantol to tell them the "second confession." Vantol stated that he learned all of the details from Cookson and that Cookson told him what to say.

On February 21, 2002, the court also heard testimony from Dr. Pakkam Rajasekaran ("Dr. Raj"), a staff psychiatrist at Acadia Hospital who treated Vantol. Dr. Raj described Vantol as a person with low average intelligence, who has a poor level of functioning, and "was more like 12 or 13 developmentally." Motion for New Trial Hearing, Vol. 2, p. 14. As Dr. Raj testified, Vantol "was easily convinced by other patients" at Acadia, and "was easily suggestible, and other people have a lot [of] influence on him." Id. at pp. 13-14.

The court finds that Vantol's testimony at the February 1, 2002 hearing was truthful and credible. The evidence strongly suggests, and the court also finds, that

---

[3] During "contact visits," inmates in the Penobscot County Jail are allowed to sit in the same room as their visitor, across a table instead of through a glass partition. An inmate has to request a "contact visit," and it must be approved by jail staff.

Cookson was the source of Vantol's information, and that Cookson planned and instigated Vantol's purported confession. It is interesting to note that neither Dr. Rajasekaran nor the State Police believed Vantol's confession, and that Vantol failed the polygraph examination performed by the State Police.

## DISCUSSION

Cookson makes four specific arguments in support of his motion. First, the discovery of the actual firearm used in the homicides is newly discovered evidence; second, Vantol's confession to committing the murders is newly discovered evidence; third, the gun evidence heard by the jury was false evidence presented by the State; fourth, the trial violated Cookson's due process rights because the jury found him guilty upon a wholly fictional version of events.

### 1. Newly Discovered Evidence of Murder Weapon and Confession

Cookson argues that both Vantol's confession and the discovery of the murder weapon are newly discovered evidence that warrant the ordering of a new trial. The State disagrees, and argues that because the defendant and his defense team knew about both the firearm and the confession prior to the end of trial, the evidence is not newly discovered, and thus no new trial is warranted.

### a. Standard

"In the interest of fostering an end to litigation and preserving the integrity of criminal judgments, [the court should] regard motions for new trials on the ground of newly discovered evidence with disfavor." State v. Brown, 552 A.2d 12, 15 (Me. 1988). "The evidence in support of the motion must be convincing, as there is a proper reluctance to give a defendant a second trial after he has had his day in court." Id.; State v. Preston, 521 A.2d 305, 310 (Me. 1987). "Consequently, the defendant who seeks a new trial must make all diligent efforts to introduce into evidence any existing exculpatory facts before he may be allowed to plead that there was a reasonable excuse for his failure to present that evidence." Id.

"To prevail on a motion for a new trial based on newly discovered evidence, the defendant must show, by convincing evidence (1) that evidence will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by exercise of due diligence; (4) that it is

material to the issue; and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict." State v. Warren, 661 A.2d 1108, 1112 n.4 (Me. 1995); State v. Dechaine, 630 A.2d 234, 236 (Me. 1993).

"It is not enough for the defendant to show that there is a possibility or a chance of a different verdict. It must be made to appear that, in light of the overall testimony, new and old, another jury *ought* to give a different verdict; there must be a *probability* that a new trial would result in a different verdict." Dechaine, 630 A.2d at 236, *quoting* State v. Arnold, 434 A.2d 57, 59-60 (Me. 1981). "The trial court determines both the weight and the credibility to be attached to the newly discovered evidence." Id.

### b. The Murder Weapon

Cookson argues that a new trial is warranted in this case, as there would be a different verdict if the jury knew that another person possessed the actual murder weapon. He asserts that although Vantol claimed to know the location of the gun on or around December 3, 2001, while the trial was in progress, there was no way to force him to make this disclosure until he chose to do so.[4] Consequently, Vantol's later disclosure of the location of the gun is newly discovered evidence warranting a new trial.

---

[4] The defense also asserts that Vantol never made any claim that the weapon he used in the killings was a different gun than that claimed by the State to be the murder weapon. During the Motion for New Trial hearing, Attorney Maselli questioned Vantol about this very issue:

Q: And you said you knew where the gun was, correct?
A: Yes
Q: And we said, okay, where's the gun? And you refused to tell us; do you recall that?
A: Yes.
Q: You said, I'm not producing the gun until the trial is over?
A: (Nods head up and down)
Q: Do you remember that?
A: Yes, Jeff was out, one of the two.
Q: Until Jeff was out?
A: Yes.
Q: And we said, why is that? And you didn't really answer, right?
A: Right.
Q: But you refused to give out any information concerning the gun even though you were asked, correct?
A: Yes.

Motion for New Trial Hearing Transcript, Vol. 1, p. 80. This court finds, however, that by stating that he knew the location of "the gun," especially in the context of a confession to two murders where the deaths were caused by gunshots to the head, it is plain enough that Vantol was referring to the gun used to kill Mindy and Treven. The court can think of no other gun to which Vantol would have been referring when he stated "I know the location of *the gun,*" and "I'm not producing *the gun* until the trial is over."

The State, on the other hand, asserts that the defense's lack of due diligence defeats this newly discovered evidence claim regarding the discovery of the actual murder weapon. Once the defense learned during the trial that Vantol knew the location of the gun, it chose not to pursue or challenge the gun evidence.

There is no question for this court that the defense has met the fourth and fifth elements here. More questionable, however, is whether the defense has met the first three prongs of the five-prong test promulgated by the Law Court in Warren and Dechaine. The court finds that it has not met the second and third prongs, and thus cannot win under a newly discovered evidence argument.

The second prong states that the evidence must have been discovered since the trial, and the third prong requires that the evidence could not have been discovered before the trial by the exercise of due diligence. See Warren, 661 A.2d at 1112 n.4; Dechaine, 630 A.2d at 236. In this case, the defendant knew Vantol was claiming to know the location of the gun prior to the close of trial, but asserts that there was no way of compelling Vantol to reveal this information until he chose to do so. The court finds that there were several avenues the defendant could have taken.

Foremost, Cookson could have brought this information to the court's attention. Cookson asserts in his brief that he did not take that avenue because

> [Vantol] would have been appointed an attorney who would have refused to allow him to answer questions, and perhaps Vantol might have disclosed the location of the gun, though this is mere speculation and directly contrary to what Vantol insisted he would do, and then perhaps the State would have located the gun as well as discovered it was not the firearm they had been presenting evidence about, and then determined that this newly discovered gun was indeed the murder weapon and thus all their firearms evidence was false, all this occurring while this same jury was supposedly standing by in some suspended state of animation, had the State even requested some type of delay or if the Court had granted such, which would have been itself unprecedented and alone would have resulted in the declaration of a mistrial, perhaps over the objection of Defendant and raising serious Double Jeopardy concerns.

Defendant's Brief, pp. 12-13.

This argument is based on pure conjecture. It is beyond reason to attempt to predict what would have happened had the defense divulged this information to the court

10

upon its learning of Vantol's revelation. If the defense had revealed this information, it would have been the court's decision of which step to take next. The court could have, *inter alia*, compelled Vantol to take the stand – and at least force him to assert his Fifth Amendment privilege, allowed a continuance, or granted a mistrial. Instead, Cookson took the decision into his own hands. The court finds that Cookson has shown no reasonable excuse for his failure to present this to the court, and thus finds that it is not newly discovered evidence. See State v. Redford, 804 P.2d 983, 986 (Kan. 1991) (testimony of codefendant, who had elected not to testify at defendant's trial on fifth amendment grounds, was not newly discovered evidence for purposes of defendant's motion for new trial; content of codefendant's testimony was known to defendant at time of trial, and defendant failed to show he used reasonable diligence to obtain witness's testimony).

Cookson made a strategic decision to withhold this information until after the verdict. As a matter of fact, he revealed this information to the court mere minutes after the verdict was read. He cannot now come to the court and declare that this information is newly discovered evidence. See United States v. Turns, 198 F.3d 584, 587 (6th Cir. 2000) (affidavits submitted by defendant's sister, both tending to exonerate defendant, were not "newly discovered evidence" warranting a new trial, even if sister had threatened to lie if called as a witness and then, after trial, decided to testify truthfully on defendant's behalf; defendant was aware at time of trial that his sister possessed the information set forth in the affidavits, but, because defendant and his counsel believed that she would not tell the truth, they made strategic decision not to call her as witness).

The defendant's choice not to bring this information to the court during the trial demonstrates that it is not evidence that has been discovered since the trial and is not evidence that could not have been discovered before the trial with due diligence. Thus, the defendant's Motion for New Trial is denied on this ground.

### c. Vantol's Confession

Cookson next argues that Vantol's confession constitutes newly discovered evidence justifying a new trial. The State, in turn, argues that, for the same reasons cited earlier, the confession is not newly discovered evidence and that it is not grounds for a new trial.

11

This case is similar to State v. McDonough, 350 A.2d 556 (Me. 1976), in which the Law Court held that a pre-trial confession by the defendant's brother to the defendant's attorney that he was the one who had committed robbery, not his brother, did not constitute newly discovered evidence requiring a new trial where the defendant and his attorney were aware of the confession at the time of trial but nevertheless decided that the circumstances prevented them from presenting it to a jury. Id. at 560. At the hearing, Cookson tried to distinguish McDonough by arguing that in this case it is Vantol's confession to the police, not to Cookson's attorneys, that is the newly discovered evidence. The court disagrees. The court in McDonough held that the very fact that the defendant and his attorney were aware of the defendant's brother's confession at the time of trial precluded the confession from being labeled "newly discovered." Such is the case here. Vantol confessed to the defense prior to the end of the trial. Thus, Cookson was aware of Vantol's confession at the time of the trial, and "[e]vidence known to the accused at the time of trial cannot be considered newly discovered." Id. The fact that Vantol confessed to the police after the trial is of no consequence. The fact remains that Cookson knew of the confession prior to the conclusion of the trial. It is not, therefore, newly discovered.

Even assuming, arguendo, Vantol's confession to be true, Cookson personally knew what happened from day one. Therefore, "[i]n choosing not to call [Vantol] to the stand, the defendant made a tactical decision. That his decision proved fruitless should not constitute a reasonable excuse for his failure to attempt to introduce the evidence at trial." Id. at 561. See State v. Flaherty, 340 A.2d 212, 214-215 (Me. 1975) (evidence indicating that defendant received stolen articles from another person was not grounds for new trial, since, if that was the case, defendant personally had that information at trial but failed to present it); State v. Lund, 266 A.2d 869, 877 (Me. 1970) (after trial, defendant led police to area where he buried sheets with small bullet holes in them; court held this was not newly discovered evidence, as the evidence was known to the defendant at all times during the trial). See also United States v. Warren, 140 F.3d 742, 745 (8th Cir. 1998) (defendant must have known, at trial, that another person was with him when he was in witness's garage at time cocaine found by witness therein disappeared, and therefore witness's posttrial testimony regarding presence of second person was not

newly discovered evidence that could support award of new trial; "evidence within defendant's knowledge at the time of trial which could have been communicated to defense counsel could not later be classified as newly discovered evidence."); State v. Redford, 804 P.2d 983, 985 (Kan. 1991) (defendant who was convicted of kidnapping was not entitled to new trial based on newly discovered evidence that defendant and victim had registered in hotel room on night of kidnapping, where defendant knew hotel registration was not under his name but failed to relay such information to his attorney at time of trial); People v. Pellot, 570 N.Y.S.2d 46, 47 (N.Y.A.D. 1 Dept. 1991) (codefendant's proposed testimony, disclosed for first time during jury deliberations, that codefendant had stolen property while defendant remained in vehicle, unaware of what was going on, was not the type of newly discovered evidence that could have formed basis for postverdict motion; defendant could have, but did not, present that version of facts to jury).

## 2. Ballistics Evidence

Cookson argues that it is impossible to say that the ballistics evidence offered by the State at trial did not affect the decision of the jury, and that because that evidence was erroneous, the court should order a new trial. The State, on the other hand, maintains that if the defense had hired its own ballistics expert and had cross-examined Bachelder and/or Helms during the trial, then the mistaken testimony would have been discovered. Cookson asserts, however, that the burden was on the State to present correct and reliable evidence in its prosecution, and that he had no duty to either produce an expert or cross-examine the State's experts.

The defense bases its argument on the theory that the State's experts' testimony and the evidence of the gun presented at the trial were false evidence. It is true that "[w]here false testimony, whether intentionally solicited or not, may have affected the outcome of a trial, not only is the trial fundamentally unfair, but the truth-seeking function of the trial process itself is unacceptably compromised." State v. Brunette, 501 A.2d 419, 423 (Me. 1985), *citing* United States v. Agurs, 427 U.S. 97, 104 (1976). The court, however, finds that the false evidence standard does not apply in this case, as there is absolutely no evidence suggesting that the experts' testimony was perjurious or that the State intentionally solicited or offered testimony or evidence it knew to be false.

13

The defendant cites several cases in support of his "false evidence" argument. In each of those cases, the State used evidence it knew to be false. See United States v. Agurs, 427 U.S. 97 (1976) (State failed to disclose to defense counsel criminal background of victim, even though it knew about it); Giglio v. United States, 405 U.S. 150, 153 (1972) (where government promised witness that if he testified before grand jury and at trial he would not be prosecuted, witness testified under cross-examination that no one had promised him anything in exchange for his testimony, and government attorney stated in his summation that the witness had received no promises, court reversed conviction and remanded); Napue v. Illinois, 360 U.S. 264, 269-270 (1959) (where witness testified in response to government's question that he received no promises in exchange for his testimony, government attorney knew that this testimony was erroneous and did not correct it, court reversed conviction); State v. Willoughby, 507 A.2d 1060, 1069-1070 (Me. 1986) (court correctly found that State had not knowingly solicited and presented perjured testimony); State v. Brunette, 501 A.2d 419, 423 (Me. 1985) (state knowingly solicited false information from witness). The court agrees with, and believes the case law in Maine to be aligned with, the Missouri Supreme Court's interpretation of Napue and its progeny: "As Napue itself states, the law concerning false testimony arises because the concept of ordered liberty cannot allow the state to *knowingly* use false evidence to obtain a conviction. There is no indication here that at the time of trial [the expert's] testimony was known to be false either by the state or by [the expert] himself. The law concerning false testimony is inapplicable to this case." State v. Hamilton, 791 S.W.2d 789, 794 (Mo. 1990) (emphasis original) (citation omitted) (state expert mistyped defendant's and victim's blood at trial).

An analysis of the term "false evidence" leads the court to a similar conclusion. Although the court was unable to find any criminal case defining the term, there are several civil cases and definitions that lend assistance in extracting the meaning of the phrase. "False evidence, whether in the form of perjured testimony under oath in open court or in a pleading or affidavit admitted into evidence, is defined as intrinsic fraud." Global Travel Agency, Inc. v. Metal Recovery Technologies, Inc., 727 N.E.2d 1101, 1104 (Ind. App. 2000) (civil matter); Glover v. Torrence, 723 N.E.2d 924, 932 (Ind. App. 2000) (civil matter). "[T]he court should not set aside a verdict and vacate its judgment

14

because it is subsequently shown that false testimony was given at the trial, or even that the party in whose favor the verdict was given testified falsely. *Something more than that must appear.* It must be shown that the winning party *willfully* gave false testimony or willfully made use of false evidence to obtain the verdict, and the court must be reasonably satisfied that the verdict was thereby obtained." Hill v. Libbey, 110 Me. 150, 157-158 (1912) (emphasis added) (civil matter); Ordway v. Cluskey, 129 Me. 13, 19 (1930) (same). Furthermore, a "false statement" is a "[s]tatement knowingly false, or made recklessly without honest belief in its truth, and with purpose to mislead or deceive. An incorrect statement made or acquiesced in with knowledge of incorrectness or with reckless indifference to actual facts and with no reasonable ground to believe it correct. Such are more than erroneous or untrue and import intention to deceive." BLACK'S LAW DICTIONARY 417 (Abr. 6th ed. 1991).

Cookson has submitted no evidence indicating that either the State or its experts introduced or testified to evidence it knew was incorrect. Rather, the evidence points to the conclusion that the information submitted was mistaken. The State's experts' opinions were true and correct to the best of their knowledge at the time of the trial.

Even applying a "newly discovered evidence" standard, however, Cookson's argument fails scrutiny. As stated earlier, in order to prevail under a new trial motion based on newly discovered evidence, the defendant must show, *inter alia*, that the evidence could not have been discovered by exercise of due diligence. See Warren, 661 A.2d at 1112 n.4; Dechaine, 630 A.2d at 236. The fallacy of the experts' testimony could have been brought out on cross-examination or by the examination by a defense ballistics expert. At the trial, the defense neither cross-examined Bachelder and Helms, nor put his own ballistics expert on the stand. Doing so may have, at the least, put the State's experts' credibility before the jury, and may have created reasonable doubt. Indeed, at the motion for a new trial hearing, Hathaway indicated that he would have declared the findings inconclusive if he had examined the ballistics evidence available prior to the trial. Nevertheless, Cookson made the tactical decision to not cross-examine or call his own expert.

In his brief, Cookson stresses how important the ballistics evidence was to the State's case. Assuming that to be true, the court cannot overlook Cookson's failure to

counter such critical evidence. The court finds that the defense made a tactical decision not to cross-examine the State's experts and not to hire its own ballistics expert. Cookson cannot now claim that the mistaken testimony is "newly discovered," when due diligence would have uncovered the mistake prior to the trial. See State v. Casale, 150 Me. 310, 313 (1954) (if defendant, for reasons of strategy, produced no evidence in criminal case, and the strategy was unsuccessful, he is not entitled to a new trial, on ground of newly discovered evidence, to secure an opportunity to introduce evidence that he could have introduced at trial). See also Harris v. United States, 9 F.Supp.2d 246, 254-256 (S.D.N.Y. 1998) (evidence of perjury by government witness is not newly discovered and does not warrant new trial if defendant knew or could have discovered the perjury by the exercise of due diligence); United States v. Austin, 103 F.3d 606, 609-610 (7th Cir. 1997) (defendant convicted of selling counterfeit artwork was not entitled to new trial based on newly discovered evidence, even if art expert's testimony in earlier, unrelated prosecution showed that their testimony in defendant's trial was false; given availability of other experts, defendant could not have been unaware of testimony's falsity or surprised by and unable to meet testimony); Gray v. State, 725 A.2d 364, 366 (Conn. App. 1999) (defense expert testimony concerning diesel fuel antigel and flammable solvent, which testimony could have been presented at first arson trial to support defendant's case, was not newly discovered material which would permit new trial based on newly discovered evidence); and Pierce v. State, 786 P.2d 1255, 1264 (Okl. Cr. 1990) (testimony of prosecution expert could not properly be impeached through affidavits and testimony of defense experts presented at hearing on motion for new trial, especially when such evidence was readily available during the trial; such evidence did not constitute newly discovered evidence supporting new trial; "Impeachment of this nature should have been done through the presentation of witnesses at trial and through cross-examination). The defendant's motion is, therefore, denied on this ground.

### 3. Due Process Violation

Because the court has found that all of the defendant's arguments have no merit, the court finds that State did not deprive the defendant of a fair trial and did not violate his due process rights. The defendant's motion is also denied on that ground.

THE DOCKET ENTRY IS:

The defendant's Motion for New Trial is DENIED. Sentencing is now set for October 15, 2002 at 1:00p.m.

_____
Justice, Superior Court

**DATED:** August 9 , 2002

ATTORNEY FOR THE STATE:

    LISA MARCHESE ASST A G
    OFFICE OF THE ATTORNEY GENERAL
    6 STATE HOUSE STATION
    AUGUSTA  ME  04333

ATTORNEY FOR THE DEFENDANT:

    WILLIAM MASELLI ESQ
    98 COURT STREET

    AUBURN  ME  04210